## UNITED STATES v. UNIVIS LENS CO., Inc., et al.

District Court, S. D. New York.

Sept. 17, 1941.

See, also, 37 F.Supp. 459.

Robert H. Jackson, Atty. Gen., of United States, and Stanley E. Disney, Irving B. Glickfeld, John E. McCracken, George L. Derr, and Samuel S. Isseks, Sp. Asst. to Atty. Gen., Sp. Attys., for plaintiff.

Frederick S. Duncan, of New York City, and Toulmin & Toulmin, of Dayton, Ohio (Frederick S. Duncan, of New York City, and H. A. Toulmin, H. A. Toulmin, Jr., and Rowan A. Greer, all of Dayton, Ohio, of counsel), for defendants.

GALSTON, District Judge.

The complaint charges violations of Secs. 1 and 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 3, and alleges that the Univis Lens Co., Inc. (which will hereafter be referred to as the Lens Company), manufactures bifocal lenses pursuant to an unlawful combination and conspiracy in which the Univis Corporation is accused of having unlawfully set up a system of price control through the issuance of licenses to the Lens Company and others and by means of so-called fair trade agreements to certain wholesalers and retailers; that such lenses are covered by patents owned by the Univis Corporation and that the Lens Company owns a majority of the stock and controls the activities of the Univis Corporation. The individuals named as defendants are officers in both companies.

It is alleged that the conspiracy to restrain interstate commerce in bifocal lenses consisted in combining (1) to designate, and select, according to certain arbitrary rules and regulations, wholesalers and retailers to handle and deal in bifocal lenses manufactured by defendant Univis Lens Company; (2) to sell such bifocal lenses only to such designated and selected wholesalers and retailers; (3) to restrain such wholesalers and retailers from selling to other wholesalers and retailers not so selected; and (4) to fix uniform, arbitrary and unreasonable prices at which such wholesalers and retailers could resell such bifocal lenses.

The challenged plan adopted by the defendants involved three types of licenses to control all stages of the marketing of Univis bifocal lenses, through licenses to wholesalers, to retailers with facilities for finishing rough or semi-finished bifocal lenses, and to prescription licensees, i. e. retailers with no finishing equipment. By these means, so the Government contends, the defendants maintain a complete control of the marketing of Univis bifocal lenses including the fixing of minimum resale prices to the purchasing public. It is asserted that they refuse to issue licenses to wholesalers and retailers who are price-cutters or who otherwise engage in business practices of a nature disapproved by the defendants; also that the Lens Company sells the rough lens blanks only to Univis licensees or to consumers. Accordingly the Government seeks to have the contracts and combinations and conspiracies in restraint of interstate commerce decreed unlawful and the defendants enjoined.

The defendants admit that the Lens Company and the Univis Corporation to all intents and purposes are the same and that the individual defendants have owned or control both corporations. The Univis Corporation avers that it has consistently followed an "open end" license policy by which all licensees of the same class are charged the same license fee and have the same prices fixed for performing the same manufacturing service; and that the licenses are open to all qualified licensees. The basis of its policy is the maintenance of highest standards of quality, service and performance by each licensee at each stage of the manufacturing process. Such policy is founded upon the peculiar nature of the business of manufacturing, prescribing, fitting and distributing eyeglass lenses in a series of successive steps, by different types of manufacturing establishments at different distances from the customer. It is said that the "blanks" must be manufactured out of blocks of glass in which the near vision inserts are fused to form the same fabricated product from which the bifocal lenses are ultimately to be made; also that the lens blank, at such stage of manufacture, is not useful as an eyeglass lens and must be subjected to manufacturing processes by other licensees and finally fitted to the eyes of the wearer through a suitable examination of the eyes. As a matter of practice the retailer licensee who is in direct contact with the customer is alleged to participate in the manufacturing steps of fitting the lenses in accordance with the prescription of the lens in that he must determine the shape, the centering and the positioning thereof on the face of the wearer and the mounting of the lens in a frame in order to give the maximum vision and comfort to the wearer. The prescription for grinding is forwarded to a wholesaler to whom the lens blank has been sold by the Lens Company. The lenses when completed are then in turn delivered to the finishing retailer who adjusts and fits them to the eyes of the wearer.

On the question of price the answer alleges that the wholesaler purchases the manufactured rough Univis blank generally for $3.25. The process practiced by the wholesaler in following the prescription received from an optometrist, dispenser or opthalmologist entails great accuracy and

requires, so it is alleged, from three and a half to four hours for each pair of lenses. The wholesaler receives an average gross profit of approximately $3.70 for a pair of lenses. The total average margin of gross profit for the retailer is stated to be about $9 per pair of lenses.

Specifically answering the complaint the defendants deny any violations of the Sherman Act and aver that until the manufacture of the products under the patents and trade-marks is completed and delivered to the ultimate wearer of the lenses there has not passed in interstate commerce any such thing as a bifocal lens; that the blanks are not bifocal eyeglass lenses; that what passes from the Lens Company to the wholesaler is a blank, not an eyeglass lens and that there is but one sale of the completed lens and that occurs when the retailer sells it to the customer, the particular user.

The Government's proof establishes that the Lens Company manufactures bifocal blanks under license from the Univis Corporation. The license between the two corporations refers to other contracts which are not before the court and accordingly is not in itself a complete instrument. It does appear that the Univis Corporation is to receive on all lenses manufactured in the United States and sold in the United States by the Lens Company a royalty of $.50 per pair to be paid by the Lens Company to the Univis Corporation. The Lens Company is to sell to none other than those appearing from time to time on an approved list of prescription purchasers to be submitted by the Univis Corporation. On the whole the instrument affords very unsatisfatcory proof of the terms and conditions of the agreement between the Univis Corporation and the Lens Company.

It is important at this stage to understand what a lens blank is. Silverman's definition, and it is not contradicted in the case, is that such a blank is a rough piece of glass or a partly manufactured piece of glass. As manufactured and distributed by the Lens Company the lens blank consists of reading and distance segments; and in the case of trifocal lenses a reading segment, distance segment, and an intermediate segment. The great bulk of the business done in the manufacture and distribution of the lens blanks by the Lens Company is of the bifocal character. The Lens Company sells these lens blanks to licensed distributors known as wholesalers;

also to grinding finishing licensees and to dispensing opticians who have complete grinding laboratories. In other words, the Lens Company has two types of customers; wholesalers and retailers. It is of importance to note that the lens blank sold by the Lens Company to either wholesalers or retailers could be used for no other purpose than as a lens blank to be made into a finished optical bifocal lens. The Lens Company employs service men to educate the lens grinders employed by the licensees, for these Univis lens blanks are computed on a series of corrective curves, i.e. a series of curves for each individual prescription to the end that the widest angle of vision may be obtained by the consumer. Such curves have been the subject of computation by the technical department of the Lens Company, are charted, and the chart discloses the curve to be ground on every prescription. In addition special tools are furnished to the wholesaler or finishing retailer.

It is important to distinguish between the finishing retailer and the prescription retailer. The former has a complete grinding and finishing laboratory comparable to that of the wholesaler and performs the same functions, the same grinding and finishing operations, as does a wholesaler and supplies the lenses through the stages of fitting and designing directly to the public.

A prescription retailer, if he is an optometrist, examines the patient's eyes, prescribes the lens, designs the size, the shape and contour thereof to conform with the patient's peculiar facial characteristics; designs the size, heights and positioning of the reading segment to conform to the patient's particular vocation or other personal requirements. These specifications he forwards to a laboratory for completion. On receipt of the completed lenses from the laboratory he fits the lenses to the patient's face.

To determine whether the licensing scheme of the defendants is within the monopoly of the patent grant it is necessary critically to examine the terms of these licenses.

Concededly the Lens Company has the right to manufacture lens blanks and to sell them as restricted by the Univis Company only to those who are either licensed wholesalers or licensed retailers. There can be no doubt that the owner of a patent has the right to license another to make and sell the patented article only to pur-

chasers approved or designated by the licensor.

In the second stage of the licensing plan, that which is manufactured by the Lens Company passes by sale to such designated or approved purchasers as have been licensed by the Univis Corporation to complete the manufacturing under the patents, i.e. to convert the lens blank into a lens. But if the thing sold by the Lens Company is the patented article and that article becomes the subject of re-sale, the re-sale price cannot be controlled by the licensor, for the article would pass from the dominion of the patent. Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S. Ct. 618, 84 L.Ed. 852; Adams v. Burke, 17 Wall. 453, 21 L.Ed. 700; Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L.Ed. 502; Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L. Ed. 1041, 50 L.R.A.,N.S., 1185, Ann.Cas. 1915A, 150; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A.1917E, 1196, Ann.Cas. 1918A, 955; Boston Store v. American Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann.Cas.1918C, 447.

It is on this point that contention arises in respect to the scope of the patents. The defendants take the position that the term 'lens' * * * wherever used in this to the rough blanks but to the completed article usable for the optical purposes by the wearer. For the Government to assert otherwise, as it now does, is to contradict the allegation of its complaint. As there defined, the Government says: "The term 'lens' * * * wherever used in this complaint, means a lens manufactured of glass to give normal vision to the user thereof, as in all types of spectacles and eyeglasses * * *."

Such definition conforms with the defendants' position. Nor is there proof in the case that without further processing the lens blanks manufactured and sold by the Lens Corporation could be used as lenses. They do not effect normal vision.

A reading of the patents in suit confirms this view. Patent No. 1,632,208 is for a lens. The invention relates to lenses that are to be used with spectacles and the like. The patentees state that in the manufacture of fused lenses a circular plate of glass of greater refractive index than that of the main lens is fused into the main lens, that it is found that the lower part of the plate is hardly if at all used for reading purposes, and that such lower portion prevents the wearer from seeing the ground. The patentees also observe that the upper portion of the plate is not used in reading. Therefore, it is suggested that a plate of a plurality of pieces of different refractive indices be formed, of which one is to be a reading portion. In this patent it would appear that that which is referred to as the circular plate of glass is a lens blank and not a lens, and that the claims of the patent refer to completed lenses. The rough lens blank made by the Lens Company would not fall within any of the five claims of this patent.

Patent No. 1,845,940 to Stanley also is entitled an invention for a lens. The term "lens" refers to an article in its finished state for use by the wearer. Of the ten claims there is only one which defines but a segment of the complete lens. Claim 7 covers an article of manufacture for use "as a short distance insert of a crown glass major lens comprising a circular body formed of a central portion of flint glass * * *"; but the article thus defined is not a rough lens blank.

Patent No. 1,876,497 to Hancock is for a trifocal lens. The five claims of the patent all define a lens for use as such and there is nothing in the specification which would narrow the scope to a rough lens blank.

The claims of patent No. 1,879,769 to Silverman cover only a method for producing a lens to eliminate prismatic imbalance.

Patent No. 1,899,777 to Stanley relates to bifocal lenses. The inventor states the objects of his invention are to provide a bifocal lens blank and another to provide a bifocal lens, thus indicating the difference between a lens blank and a lens. After describing the processing of the lens he says: "The resulting lens of my invention has the very substantial advantage of wide lateral, long distance vision on either side thereof, easy long distance vision above the flat top of the insert, a very deep reading area with sufficient place below this reading area for long distance vision as in walking upstairs, etc."

Thus the fifteen claims of that patent all cover a finished lens.

Patent No. 1,932,100 to Culver relates to improvements in lenses, particularly fused bifocal lenses. The main object of the invention is to provide a new strong, con-

vex or cataract fused, bifocal lens. The eleven claims relate to a finished lens adapted for use as a lens.

Patent No. 2,030,968 to Culver is for an invention relating to opthalmic lenses. This too is for a finished lens ready for use. The specification describes a method by which the product is patented.

Re-issue patent No. 19,142 to Hancock is of original patent No. 1,876,497, heretofore considered. It defines a finished trifocal lens.

Patent No. 2,183,885 is for a multifocal lens, the two claims of which define a complete lens.

The remaining patents owned or controlled by the defendants, with the exception of one covering a polishing machine, and two for telescopic bifocal lenses which are in no way related to the subject matter of this cause, relate to methods for making lenses.

■ Hence it must be concluded that what the Lens Company manufactures and sells to the wholesalers or the finishing retailers is not a lens. Thus the patent monopoly is not exhausted by the manufacturing operations of the Lens Company. The monopoly is not exhausted until the article is complete, according to the terms of the several patents. Moreover, the sale by the wholesaler of its product and of the finishing retailer of its product is not the article in the state of manufacture purchased by them from the Lens Company. Within the patent monopoly these licensees carry on the manufacture of a somewhat "raw" product to a state of completion. Hence what they sell is not a re-sale of the article purchased from the Lens Company. Such sale does not fall within the ban of those authorities which discountenance re-sales as being beyond the scope of the patent monopoly.

Nor is the control by the Univis Corporation of the manufacture and sale of the lens blank beyond the monopoly of its patent grants. It would appear that any one other than a licensee, either making or selling a blank having all of the patented elements in combination, and which has no use except to be converted into a finished lens, would be making an article of manufacture specially designed and intended for the purpose of being ultimately made into the finished eyeglass lens, as covered by claims of the patents of the Univis Corporation. That would be an act of contrib-

utory infringement. Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816. The situation is not one in which the patentee seeks to control an unpatented element of a combination and so differs from Carbice Corporation v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819. Nor does it fall within the condemnation of Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. Here the owner of the patents neither manufactures nor sells a product covered by the patents. The rough lens blank made by the Lens Company as a licensee is not a standard article of commerce. The Univis Corporation, by its system of licenses to initial and final manufacturers, has established its own system of manufacture and seeks the reward of the invention defined in the patents and not in any dissociated element in the patents. Neither Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, cited by the Government, nor American Lecithin Co. v. Warfield Co., 7 Cir., 105 F.2d 207, is in point.

The license to the wholesaler or distributor recites that the wholesaler or distributor "is desirous of being placed upon the approved list to purchase from the approved manufacturing licensee of the Univis Corporation rough lens blanks embodying one or more of said inventions * * * and of completing the manufacture thereof according to suitable prescriptions for the use of the purchaser who will wear the resulting bifocal eyeglass lenses". The license is non-exclusive, non-assignable, and conveys the revocable right "to complete the manufacture of Univis bifocal lenses * * * and to sell the said finished Univis bifocal lenses made from said blanks only in accordance with the terms and conditions set forth herein and as may be established from time to time pursuant to this contract * * *".

The license stipulates that: "It is further agreed between the parties, as the essence of this contract, that ―――― Company (i.e. the licensee) will sell the Univis bifocal eyeglass lenses * * * only to such persons, firms, corporations * * * designated from time to time by the Univis Corporation as being upon an approved list to purchase from the ―――― Company (i.e. the licensee) * * * and agree to sell no blanks as blanks except to licensed finishing licensees whose names appear as

such on the approved list of the Univis Corporation."

■ The licensee "agrees to sell Univis bifocal lenses * * * at the present prescription schedule of prices established by the Univis Corporation; and agrees to furnish partly finished Univis lenses * * at the present finishing licensee schedule of prices established by the Univis Corporation * * *".

This license likewise appears to be within the scope of the patent monopoly. The right to complete the manufacture of an article falls within the control of dominion of the patents of the Univis Corporation. As has been indicated, up to now there has been no-resale violation, and since the holder of a patent may exclude all others from making, using or selling the patented invention, he is likewise free to designate those who may exercise any or all rights conferred by the patent. Thus he may arbitrarily carve his monopoly into as many segments as he elects by giving territorial rights to some, manufacturing rights to others, and the right of use to still others. He may establish his own royalties. He may fix prices at which manufacturing licensees are to sell their products and limit *the sale thereof to designated purchasers.* See Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. United Shoe Machinery Company, 247 U.S. 32, 38 S.Ct. 473, 62 L. Ed. 968; Paper Bag Patent Case, 210 U.S. 405, 28 S.Ct. 748, 52 L.Ed. 1122; E. Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058; Eastern States Retail Lumber Dealers' Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490, L.R.A. 1915A, 788; United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007; Federal Trade Commission v. Beech-Nut Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A.L.R. 882; United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443.

■ Nor does the owner of a patent violate the Sherman Anti-Trust Law by fixing prices in license agreements under which articles may be manufactured and sold by the licensees. United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; E. Bement & Sons v. National Harrow Co., supra; United States v. United Shoe Machinery Co., supra; Ethyl Gasoline Corp. v. United States, supra; General Pictures Corp. v. Western Electric Co., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81; Appalachian Coals, Inc., et al. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825.

In United States v. General Electric Co., 272 U.S. 476, at page 491, 47 S.Ct. 192, at page 197, 71 L.Ed. 362, Mr. Justice Taft, quoting from E. Bement & Sons v. National Harrow Co., supra, said: " 'The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal.' "

In the same opinion Mr. Justice Taft observes that it has been argued that E. Bement & Sons v. National Harrow Co., supra, has been in effect overruled, and after a consideration of Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L. Ed. 645, Ann.Cas. 1913D, 880; Motion Picture Patents Co. v. Universal Film Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A. 1917E, 1187, Ann.Cas. 1918A, 959, and Heaton-Peninsular Button-Fastener Co. v. Eureka Specialty Co., 6 Cir., 77 F. 288, 35 L.R.A. 728, he says: "The overruling of the Dick case and the disapproval of the Button-Fastener case by the Motion Picture [Patents] case did not carry with it the overruling of [E.] Bement [& Sons] v. [National] Harrow Company. The Button-Fastener case was cited in the case of [E.] Bement [& Sons] v. [National] Harrow Company to sustain the decision there by what was an a fortiori argument. The ruling in the former case was much broader than was needed for the decision in the latter. The price at which a patented article sells is certainly a circumstance having a more direct relation and is more germane to the rights of the patentee than the unpatented material with which the patented article may be used. Indeed, as already said, price fixing is usually the essence of that which secures proper reward to the patentee."

■ Thus it must be concluded that price fixing agreements in respect to patented articles or methods, as the Government contends, are not illegal per se. So

that up to the time that there is no re-sale of the patented product, the agreements between licensor and licensee cover a field of valid control. It is only after that point is reached that price fixing, under a patent license system, becomes unlawful. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. Patent control presents a condition which makes such cases as United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; United States v. American Tobacco Co., 221 U.S. 106, 31 S. Ct. 632, 55 L.Ed. 663; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, inapplicable.

█ Moreover the use of the license system to exclude persons from the market because they cut prices is not an abuse of the patent privilege. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, 7 A.L.R. 443. That right is expressly recognized in the Ethyl case and the effort of the Government to find analogy between the factual situation therein and the case at bar must fail. In the former, as Mr. Justice Stone observes, the scene is one "in which appellant has established the marketing of the patented fuel in vast amounts on a nationwide scale through the 11,000 jobbers and at the same time, by the leverage of its licensing contracts resting on the fulcrum of its patents, it has built up a combination capable of use, and actually used, as a means of controlling jobbers' prices and suppressing competition among them." [309 U.S. 436, 60 S.Ct. 626, 84 L.Ed. 852.]

The Univis Corporation Finishing License contract in essential respects is similar to the Distributor Contract and its legality responds similarly to the same tests. This form of contract is valid as being within the monopoly control of the patents.

█ The so-called "franchise to prescribe and fit Univis lenses" seeks quite a different form of control. It is a memorandum of agreement made between a "distributor" and one designated as the "representative." The appositeness of the term is not explained.

The "representative" agrees to maintain minimum retail prices to insure high standards of manufacture, use and sale of the product. The record shows that this "representative" performs no manufacturing operation. He examines his patient or customer and writes a specification which he forwards in the form of a purchase order to the wholesaler or distributor for the manufacture of the completed lenses. He receives a patented article to which he has the full legal title. At that point the patent monopoly is exhausted. The owner of the patent, the Univis Corporation, no longer may lawfully control the re-sale price of that finished article. To contend that the "representative" has to adjust the finished lenses to the nose of the wearer by taking a pair of pliers and manipulating the nose clips or the ear pieces is not to bring such activities of the "representative" within the control of the patent grant. He has added nothing to the patented product. Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; Adams v. Burke, 17 Wall. 453, 21 L.Ed. 700; Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086; Dr. Miles Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; Bauer & Cie v. O'Donnell, 229 U.S. 1, 33 S.Ct. 616, 57 L.Ed. 1041, 50 L.R.A., N.S., 1185, Ann.Cas. 1915A, 150; Straus v. Victor Talking Machine Co., 243 U.S. 490, 37 S.Ct. 412, 61 L.Ed. 866, L.R.A. 1917E, 1196, Ann.Cas. 1918A, 955; Boston Store v. American Graphophone Co., 246 U.S. 8, 38 S.Ct. 257, 62 L.Ed. 551, Ann.Cas. 1918C, 447.

It must be concluded, therefore, that the so-called franchise agreement with the "representative" is illegal and should be stricken down.

█ Evidence of further attempt to restrain competition in interstate commerce is urged by the Government in the fair trade agreements which the Univis Lens Company makes with the Wholesaler, Finishing Retailer and Retailer. The defendant's position is that these agreements are within the Miller-Tydings Amendment of August 17, 1937, C. 690, Title VIII, 50 Stat. 693, 15 U.S.C.A. § 1, to Sec. 1 of the Sherman Anti-Trust Act. That amendment in part provides: "That nothing herein contained [in sections 1–7 of this title] shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity, and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transac-

tions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made * * *."

The agreements designate the Lens Company as the "Manufacturer". The Manufacturer is described as engaged in the production and distribution of eyeglass lenses which are distributed and sold under the trade-marks of the Manufacturer "who is the owner thereof" and particularly under the trade-mark "Univis", and which eyeglass lenses are stated to be in fair and open competition with lenses of the same class produced by others.

Further recitals declare that these trade-marks and the shapes of insert in the lenses having a straight top constitute a valuable part of the good will of the business of the Manufacturer, enabling the public to identify the eyeglasses of the Manufacturer and Wholesaler (or of the Manufacturer and Retailer) "as being the product of the scientific research, manufacturing skill, inspection and standards of workmanship of the Manufacturer and Wholesaler" or the Manufacturer and the Retailer as the case may be.

The agreements state that the Wholesaler, the Retailer and the Finishing Retailer are all engaged in the sale of eyeglass lenses under the trade-mark "Univis", with a straight top insert "as supplied to it by the Manufacturer".[1]

The Wholesaler and the Finishing Retailer agree that they will not offer for sale such eyeglass lenses at less than the minimum resale prices then in effect for such commodities as established hereunder from time to time by the Manufacturer. In the agreement with the Retailer, he too undertakes that he will not offer for sale or sell such eyeglass lenses at less than the minimum resale prices as fixed by the Manufacturer.

There have been offered in evidence two certificates of trade-mark registration to the Lens Company. The first trade-mark, No. 235,817, covers the "Univis" and recites that the mark has been continuously used for opthalmic lenses and applied to said goods in applicant's business since January 20, 1927. The second trade-mark is for the name "Universal Visibility", certificate No. 250,138, but apparently is not involved herein.

Though the Government has not challenged the ownership of the trade-mark "Univis", a consideration of the record in this case leads to speculation as to such ownership, for these fair trade agreements designate the Lens Company as the Manufacturer of the lenses. But it will be recalled that the contention of the defendants is that the Lens Company manufactures lens blanks. These two positions are inconsistent. Silverman, to the question "What is the business of the Univis Lens Company?" answered: "It is the manufacturing licensee that manufactures and distributes Univis lens blanks; the complete multifocal lens blanks."

It is true that to the next question, "But it manufactures and distributes only lens blanks?" he answered: "That would not be entirely accurate. There are a few lenses, special lenses, that are ordered occasionally. That would be 99.9% of its work, but perhaps there is 1/10 of 1% that might be finished lenses on special order for certain customers."

In consequence it would seem that the term "Univis" as applied to eyeglass lenses, i.e., the finished lenses, identifies the product of the Wholesaler or Finishing Retailer and that the description of the Lens Company as the "Manufacturer" is not justified by its operations. The manufacturing participation therein by the Lens Company consisted only in furnishing the Wholesaler or the Finishing Retailer with the rough lens blank, and the product which is sold by the Wholesaler and the Finishing Retailer is the article to which the trade-mark applies. As between the Wholesaler, or the Finishing Retailer, the Lens Company is certainly not the Manufacturer of the lens as defined in the fair trade agreements. A fortiori, the Lens Company is not the Manufacturer of the lens purchased by the Retailer or the Wholesaler.

Certainly so far as the resale by the Retailer is concerned, he sells no commodity which bears, or the container of which bears, the trade-mark "of the producer" of such commodity. What he sells is a commodity of the Distributor or Wholesaler. But the fair trade agreements in evidence in this case are not between the Wholesaler or Distributor and the Retailer, and I can see no applicability of the Miller-Tydings Amendment to the resale activities of the Retailer. This case is not unlike

---

[1] In the agreement with the Finishing Retailer the language is "as supplied to it by the Manufacturer or Wholesaler".

Mallinson Fabrics Corp. et al. v. R. H. Macy & Co., 171 Misc. 875, 14 N.Y.S.2d 203, 205. In .that case the New York statute relating to the fair trade agreements was considered. The action was brought by the manufacturer of fabrics sold under the name "Mallinson's Pure Silk Pussy Willow" and by a co-plaintiff, a dress manufacturer. The plaintiffs sought to restrain the defendant from advertising or offering for sale or selling dresses under the trademark at a price lower than that fixed by the plaintiffs. The defendant's "Pussy Willow" dresses were not made by Mallinson, nor indeed were they those of Siegel. They were made by an unnamed manufacturer. The court observed: "As I perceive it, this dress is not a 'commodity' produced or owned 'by either plaintiff.' "

The attempt of the Lens Company, under the guise of the protection of the statute, to control the resale of that which it does not manufacture, is ineffectual. For the same reason its "fair trade" agreements with "Wholesaler" and "Finishing Retailer" are likewise unenforceable. The latter do not resell the product or commodity of the Lens Company.

■ There is an isolated instance disclosed in the record wherein, in the effort to maintain prices and to exercise an indirect control of optical goods manufactured by others, the defendants departed from the protection of their patents. It appeared that Titmus Optical Company was about to manufacture bifocal lenses alleged to be covered by the claims of the Univis patents. The Univis Corporation notified the Titmus Optical Company that it would be sued for patent infringement. But it also notified its own licensees and by such pressure kept the Titmus Optical Company out of the field by causing directly or indirectly Univis licensees to cancel orders for optical goods theretofore placed by them with the Titmus Company. Johnstone Optical Company, one of the Univis licensees, sent a copy of its telegram of cancellation of a Titmus order to the Univis Lens Company, and from the Univis letter of December 19th in reply, the nature of a concerted effort of the defendants can be spelled out. The letter recites:

"Dear Mr. Johnstone:

"The type of action exemplified by the copy of the telegram received from you is indeed appreciated at this end. It is, in effect, employing the use of a patent weapon which the better class jobber has to protect his vital interests. I trust that the numerous other jobbers throughout the United States that have expressed their readiness to adopt similar measures will act just as quickly and effectively to the end that a very valuable program will be preserved."

That other Univis licensees expressed their co-operation is shown in the letters of John S. Milam Optical Company of January 8, 1940, of the J. E. Limeburner Co. of January 8, 1940, of the Reese Optical Company, Inc., of January 9, 1940, in the office memorandum relating to the Rooney Optical Company of January 10, 1940; also by the letter of Max Zadek, Inc., of January 10, 1940, and others. Such practices are not countenanced by the patent monopoly and must be regarded as an abuse thereof. It is true that the Titmus case is but an isolated instance and it may be doubted whether the proof is of sufficient weight to justify.the conclusion that in and of itself it amounts to a violation of the anti-trust acts.

■ It must also be observed that there is no proof that the defendants exercise among themselves or by combination with others a control of all bifocal eyeglass lenses. Such lenses are produced by other manufacturers and known under the names "Full-Vue", "Panoptic", "Wide-Sight", "Ultex", and "Kryptok". There is no evidence of an agreement among the manufacturers of these lenses with the defendants to control prices or otherwise. The licensees of the defendants are not required to deal only in Univis products and the record establishes that the percentage of Univis bifocal lenses sold by the Univis licensees, as compared to other bifocal lenses sold by them, is only between five and six percent. Moreover the Univis Corporation has licensed only about fifty percent of the trade. Apparently then the defendants control but two and a half percent of the total volume of business done in bifocal eyeglass lenses. On its face such a small percent would not seem to be an unreasonable restraint of trade. Standard Oil Co. v. United States, 283 U. S. 163, 51 S.Ct. 421, 75 L.Ed. 926.

Yet the Government, relying on United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S. Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; W. W. Montague & Co. v. Lowry, 193 U. S. 38, 24 S.Ct. 307, 48 L.Ed. 608; O'Brien v. United States, 6 Cir., 1923, 290 F. 185; Vandell v. United States, 2 Cir., 1925, 6

268

F.2d 188; Hicks v. Bekins Moving & Storage Co., 9 Cir., 1937, 87 F.2d 583; Buyer v. Guillan, 2 Cir., 1921, 271 F. 65, 16 A.L.R. 216; United States v. International Fur Workers Union, 2 Cir., 1938, 100 F.2d 541; Oxford Varnish Corporation v. Ault & Wiborg Corporation, 6 Cir., 1936, 83 F.2d 764, contends that any tampering with prices, even though the members of the price fixing group are in no position to control the market—to the extent that they raise, lower or stabilize prices, nevertheless directly interferes with the free play of market forces. The distinction between Standard Oil Company v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926, and the foregoing group of cases, is that the former case turned on the validity of patent pooling agreements and whether they created monopoly; whereas in the cases cited by the Government no patent situation was involved.

But in the Standard Oil case, the court held the patent pooling and licensing legal; whereas, as has been indicated hereinbefore, the following criticisms must be made of defendants' practices in attempting to extend their control of prices beyond the monopoly of their patents:

1. The prescription license is not lawful.

2. The fair trade agreements are not lawful.

3. The concerted effort of defendants and their licensees to interfere with the business of the Titmus Optical Company is not within the patent control.

Do such violations of law constitute unreasonable restraint of interstate trade and commerce in violation of Secs. 1 and 3 of the Sherman Anti-Trust Act? It is at this point that United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L. Ed. 1129 and related cases are wholly pertinent, for the two defendant corporations have attempted to establish a monopoly in the sale of Univis bifocal lenses beyond the patent control and should be restrained. The Government is entitled to a decree, limited, however, to the extent hereinbefore indicated of declaring invalid the prescription license and unfair trade-mark agreements and restraining the defendants from the exercise of such activities as were proved in the Titmus Optical Company matter.

Submit findings of fact and conclusions of law in conformity with the foregoing opinion.

