## UNITED STATES v. UNIVIS LENS CO. et al.

United States District Court
S. D. New York.
Feb. 10, 1950.

810

Melville C. Williams, Malcolm A. Hoffmann, Special Assistants to the Attorney General, John R. Niesley, Trial Attorney, Great Neck, N.Y., for petitioner.

Cravath, Swaine & Moore, New York City, Alfred McCormack, New York City, Francis Dean Schnacke, Dayton, Ohio, Albert Rosenblum, New York City, of counsel, for respondents.

GALSTON, District Judge.

It is charged by the petitioner that the respondents have violated the Final Judgment entered in this court on September 28, 1942, in an action wherein The Univis Lens Company (hereinafter referred to as Univis) and others were adjudged to have violated sections 1 and 3 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 3. The Government filed its petition in procuring an order to show cause why the respondents should not be adjudged and held in criminal and civil contempt on the ground that since the early part of October 1942 they combined and conspired with wholesale customers of Univis to fix and influence and attempt to fix and influence the sale prices of prescription lenses; and secondly on the ground that since the early part of October 1942, Univis and Marks combined and conspired with wholesale customers to fix and influence and attempt to fix and influence the sales prices of lens blanks in violation of injunctive provisions embodied in the Final Judgment entered in this court on September 28, 1942.

The individual respondent Marks was not a defendant in the original suit. However, it was stipulated that he has full knowledge of the provisions of the Final Judgment; that he had been an employee of Univis from some time prior to 1941 to October 1949; that he was Vice President in Charge of Sales from October 28, 1944, and that since October 1949 he has been a director of Univis and is employed as a consultant by Univis on a part time basis.

It will be helpful briefly to review the earlier proceeding. The Final Judgment entered was in conformity with the Supreme Court's opinion, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408, reviewing D.C., 41 F.Supp. 258. It was charged that the defendants had unlawfully conspired to "fix uniform, arbitrary and unreasonable prices at which (the company's) wholesalers and retailers" could resell bifocal lenses, and had unlawfully conspired to use the patents of the defendant Univis Corporation to set up a licensing scheme which would give the defendants complete control of all phases of the marketing of Univis bifocal lenses, including "the fixing and maintenance of minimum resale prices of such lenses".

The Final Judgment decreed that the defendants had violated sections 1 and 3 of the Sherman Act, "by fixing the price and terms and conditions of sale at which wholesaler distributor licensees and grinding and finishing retail licensees shall sell lenses or

lens blanks, by entering into the license agreements with jobbers, distributors, wholesalers and retailers as set forth in the Complaint and therein or in any manner fixing or controlling directly or indirectly the resale prices or terms or conditions of sale at which such licensees shall sell lenses or lens blanks * * *." and the defendants were enjoined "From entering into any combination or conspiracy similar in effect or purpose with the agreements or arrangements herein declared illegal among themselves or with others in order to fix or influence or attempt to fix or influence the prices or terms and conditions of sale to be charged for lenses or lens blanks, * * *."

Those provisions the Government now contends have been wilfully violated by the respondents.

To support the allegations of the petition, the Government introduced correspondence from the files of the respondents consisting of requests by customers for copies of Univis factory lens price lists and for suggestions regarding mark-up prices on lens blanks, together with the replies of the respondents to such inquiries. Also ten wholesale customers of Univis having places of business in various regions of the United States were called to testify. The evidence thus presented by the Government, as it concedes, is of such nature that "the areas of conflict of fact are small, and the real controversy is as to the inferences to be drawn from respondents' course of conduct and its significance in law."

A conspiracy connotes concerted action under a common design to attain a common purpose. It may be to accomplish an unlawful end, or by employing unlawful means to accomplish a lawful end. In the matter at hand the Government urges an illegal purpose, i. e. of controlling prices in violation of the Final Judgment.

■ Certainly it is not sufficient to establish a conspiracy between the respondents and their wholesale customers to show that the respondents had knowledge that some of those customers were desirous of using Univis price lists as their own in respect to prescription lenses or of obtaining a mark-up price for lens blanks. To

establish the criminal conspiracy, it was incumbent on the Government to prove an intent on the part of the respondents to further, promote and cooperate in those objects in violation of the Final Judgment, see Direct Sales Co. v. United States, 319 U.S. 703, at page 713, 63 S.Ct. 1265, 87 L. Ed. 1674. It was there said that more than suspicion or knowledge is required to disclose a conspiracy; informed and interested cooperation, stimulation, instigation should be established by the Government. As will appear later in this opinion, the inquiries made by the customers were always of their own initiative and never inspired or stimulated, so far as the evidence discloses, by the respondents.

The Government does not assert the existence of any conspiracy among the customers of Univis themselves, nor indeed between the customers and any third persons. The Government's position is that an agreement or conspiracy between Univis and its wholesale customers may be inferred from these circumstances: (1) the distribution of prescription price lists in greater numbers than were needed by the wholesalers for the purpose of placing orders with the Univis factory prescription department; (2) that Univis prescription price lists did not reflect a ten per cent discount given by Univis to all of its customers upon orders for prescription lenses placed with its prescription department; (3) that when inquiries were received from its customers as to what mark-up was proper upon lens blanks, the respondents did not limit their replies to a statement that Univis was not permitted to fix any price, but went on to inform such inquiring customers of mark-ups generally obtained by their jobbers; and finally that all of the acts of the respondents must be interpreted in the light of the background of the case, i. e. the unlawful patent licensing distribution system of Univis, which brought about the institution of the antitrust suit and the Final Judgment.

The main business of Univis consists in selling lens blanks to wholesale dealers in the optical business who grind such lens blanks in accordance with prescriptions for use in eyeglasses, or who resell such lens

blanks to others including wholesalers, opthalmologists, opticians and optometrists, who then grind such blanks to prescription. Univis itself also conducts at its factory a prescription department and has done so from the beginning of its business.

Prior to the judgment of September 28, 1942, the unlawful practice of the defendants consisted in restricting the sale of lens blanks to their licensees, the wholesale dealers, and fixing the resale price of the finished product. Moreover the retailers for whom Univis ground prescription lenses were required to sell Univis lenses at minimum prices fixed by the defendants.

After the licenses had been cancelled, following the entry of the judgment, Univis sent to its customers a new price list entitled "Univis Factory Prescription Price List". This list bore the legend, "The prices listed are for lenses ground to prescription in the factory of the Univis Lens Company, Dayton, Ohio". At the same time Univis notified its customers by letter that the lists were not to be used as a suggestion or direction of prices. The Government's brief asserts that had "the wholesalers and Univis accepted the face value of these declarations as guides to their further conduct, these proceedings would not have been instituted."

The Government sought to prove that the respondents and the wholesalers did not adhere to the declarations made by Univis in the letter of October 12, 1942.

Some of the Government witnesses though did testify that they followed the Univis prescription price lists. But they made it clear that they felt perfectly free to deviate from the prices on the lists, and in fact did so on their own volition. In every instance where there was correspondence, whether in reference to resale prices of prescription lenses or lens blanks, it appears that such correspondence was initiated not by the respondents but by the wholesalers. In the replies the respondents were careful to point out that they did not fix or suggest any resale prices.

What these companies did, as related by their representatives, completely fails to prove the alleged conspiracy between Univis and its customers. There is no direct evidence of an agreement, illicit or otherwise, between the respondents and their customers to control prices. There was no showing that Univis would cut off the sale of its products to customers who departed from the prices listed, or impose any other penalty. Contrariwise, the affirmative evidence discloses that Univis was not willing to provide copies of its price lists in the numbers requested. Only sufficient numbers of such price lists were forwarded to meet the organization requirements of its customers.

To grant the relief sought in this present proceeding would be to extend or substantially to modify the provisions of section 3(c) of the Final Judgment entered in September 1942.

In effect such an extension or modification would bar Univis from following the usual and lawful business policies which are customarily practiced in industry when sellers seek to apprise their trade of the prices at which their products may be purchased. That was not the complaint or objective of the Government in the trial of the action.

The custom of the respondent Univis in giving a ten per cent discount to its prescription customers, and the failure of the price lists to reflect the giving of such discount does not spell any element of a conspiracy. It was not a devious device adopted after the Final Judgment, for long prior to the institution of the antitrust suit it had been the practice of Univis to give such a discount. The evidence here discloses that the ten per cent discount was generally accepted as marking a custom in the industry. Indeed Government's witnesses Seulowitz and McLeod so testified. The prescription price lists reflect the prices which the retailer must pay for this work directly done by Univis. It accurately informs the retailer who is desirous of ascertaining what such prices are. It is no concern of the retailer what discount is given to the wholesaler by Univis for handling the prescription. It is difficult to see how granting the discount to all wholesalers bears upon a question of conspiracy to violate the judgment herein.

As of May 1949, Univis had 352 "factory accounts" of customers who purchased lenses and lens blanks. Of that number 267 were wholesale dealers and 85 retailers. Some of the wholesalers had branch houses which dealt directly with the Univis factory, and thus received price lists directly from Univis. All in all Univis customers totaled approximately 900. Whenever Univis changed its prices, it sent one copy of the new price lists for blanks and one copy of its prescription price list to its customers, including the branch offices of those customers which had requested that copies be furnished to their branches. It does not appear that Univis at any time furnished additional copies of prescription price lists to any customer except upon request, and then only in such limited numbers as to meet the organization needs of the customer. The lists were not furnished for redistribution by the Univis customer to its own customers.

Despite the failure of the Government's case, since decision was reserved on the motion of Univis to dismiss the petition on the close of the Government's case, Univis called six witnesses having places of business respectively in New Jersey, New York, Cincinnati, Illinois, Florida and Massachusetts.

Polleck, a wholesaler in New Jersey, used the Univis price list to guide him in establishing his own prices, except as to prescription business, which he forwarded to the Univis factory. He found business highly competitive and at times he had to cut prices to meet competition.

Reidman of New York said he made his prices to conform with the prices in the New York market. Like other customers who testified to the same effect, he used the Univis list to aid him in establishing prices, but did not always conform with it.

Lanius, the general manager of the Central Optical Company of Cincinnati, became a distributor in 1939. His laboratory is one of the largest in the optical field. He explained that because of the competitive conditions in his city he actually keeps his prices lower than those indicated on the Univis list. Some considerable significance should be attached to Lanius's efforts to get business in his area. Under the old distribution system, adopted and followed by Univis prior to the institution of the Government's action attacking its price licensing system as violative of the anti-trust statute, had Lanius been a licensee, the adoption of prices lower than those specified in the license agreement would have brought disastrous consequences. The very fact that it was possible for him to lower prices without incurring reprisals by Univis is strongly indicative of an open market.

Another witness, Spero, president of Belgard-Spero, The House of Vision, of Chicago, is also a very large wholesale dealer. Spero testified that he made up his own prices using diopter classifications different from those used by Univis. His prices varied; some were the same as those on the Univis list, others were higher, others lower.

Rene Keyzer-Andre, a representative of the Pan-American Optical Company, located in Miami, Florida, explained that his prices were based on his own cost analysis, and they are lower than the Univis prescription lens price list.

The last of the Univis optical dealers was George J. Belair. His business is in Massachusetts, where his principal competitors are the American Optical Company and the Colonial Optical Company, a subsidiary of Bausch & Lomb. His prescription list differs from the Univis list.

Summing up the proof offered by the Government and by the respondents on the subject of prescription list prices, there seems to be a complete failure on the part of the Government to prove either a criminal conspiracy or a civil conspiracy. The burden of proof in respect to the former is, of course, that the allegations must be proved beyond a reasonable doubt, see Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874, and United States v. P. and W. Coat Co., D.C. 52 F.Supp. 792; and though the rule in respect to the proof of a civil conspiracy is not so rigid, nevertheless the proof to establish a civil conspiracy must be clear and convincing, see Oriel v. Russell, 278 U.S. 358, 364, 49 S.Ct.

173, 73 L.Ed. 419, and Kansas City Power & Light Co. v. N. L. R. B., 8 Cir., 137 F. 2d 77, 79.

The Government's whole case rests on the distribution of price lists to their customers, but the correspondence shows that there was no wide distribution in the sense that the wholesaler or customer obtained copies sufficient to enable it to distribute to its customers. On the contrary, as has been indicated, requests for large quantities of such price lists were rejected and only a sufficient number were sent for use by members of the customer's organization, i. e. branch houses and members of its own staff. Apparently no copies were sent to retailers, and requests of wholesalers that copies be sent to their customers were normally refused. Moreover when a new price list was determined upon, only one copy was sent to each of its customers, except when the customer asked that copies be sent directly to its branches. If in some cases it appears that more copies were sent than were required to meet the organization needs of the customer, they were isolated cases, as for example when twenty-five copies of the prescription price list were sent to the Clinton Optical Company in 1948, it was because they feared losing a good customer, since the customer had indicated displeasure at the Univis policy of mailing only copies sufficient for its organization. Conspiracy must be found on the totality of the evidence, United States v. Patten, 226 U.S. 525, at 544, 33 S.Ct. 141, 57 L.Ed. 333, 44 L.R.A.,N.S., 325.

It should be emphasized that the prescription service was an important one. Though the volume of the business was small in proportion to the sale of blanks which did not come back for prescription service, the facility afforded was an advantage which Univis properly placed before the optical trade. The prescription department was not created after the entry of the Final Judgment, but on the contrary, as has been observed, from the inception of the company's business it had been part and parcel thereof.

Nor does the Government's proof establish the existence of a conspiracy to control the resale prices of lens blanks. Neither the correspondence nor the testimony of the Government witnesses warrants the inference which the Government seeks to draw. According to the evidence about thirty inquiries were made by wholesale dealers following the Final Judgment in 1942. In thirteen of these instances the replies of Univis gave no information and stated merely that Univis did not fix or suggest resale prices.

As to mark-up, some of the correspondence may be referred to. In October 1946, Marks, replying to a letter from one Henry Hennessey, wrote: "Generally speaking, throughout the United States the average jobber gets seventy-five cents a pair more for Univis blanks when he resells them. This would be entirely up to you * * *."

In another letter Marks wrote a customer: "In checking around the country * * * I find the majority * * * are getting from seventy-five cents to one dollar more than they pay * * *. I would say that the average price is around eighty-five cents, and that if you were to charge that price it is my opinion that your competitive situation would be in line with other jobbers."

Again Marks wrote: "Some charge 50 cents, some 75 cents, some (but in isolated cases) as much as a dollar. The amount of this charge again rests with you."

Another of Mark's letters shows that he wrote to a customer: "The price differs from area to area * * *. In some highly competitive areas, the charge is as low as 35 cents."

Surely in the foregoing letters not only is there a showing of lack of uniformity but quite a definite suggestion that the price is up to the inquirer. In the instances in which information was given by the company to its customers, it appeared in four cases occurring during the administration of the OPA that Univis was no longer in position to publish any prices other than factory price lists. Univis did state that it is "customary, however, for most jobbers to charge 75¢. We do not control, nor have we established this price". In another instance the company wrote "resale price is entirely your prerogative and is usually set up by persons in your position, of

course, with what you believe is an equitable margin for the handling and stocking of the lens blanks." In a third case, the customer was informed: "We do not control the resale price of blanks. The price differs from area to area. In Cincinnati 75 cents, in Detroit $1. In some highly competitive areas, the charge is as low as 35 cents."

In 1947 and in 1948 the company continued to assert its lack of control over resale prices.

There was one letter written by Marks to Carroll L. Smith of The Southern States Optical Company, Houston, Texas, which was perhaps not felicitous in all of its phrasing. This letter was written as the result of a communication which Marks of Univis received from one of its salesmen after he had called on Smith. Smith had apparently asked this man Tippet why Univis "did not give a written OK or price list on the sale of blanks by distributors to retail outlets OKing a 3% increase, the same as Continental has". Tippet wrote Marks: "Told him that what Continental has is their own business but that during my time at Univis the only price lists I had ever seen was our own blank and Rx lists." The "Continental" referred to was a competing optical company.

On receipt of the Tippet letter, Marks wrote Smith concerning the resale prices:

"As you probably know, Smitty, the Federal Bureau of Investigation under the direction of the Department of Justice back in 1941 issued an order restraining us and several optical companys from controlling the resale price of the product after it had left our hands. Consequently, we were then put into the position where retail price lists had to be destroyed and all wholesale price lists had to be destroyed and all blank price lists other than the blank price to our jobbers were similarly destroyed. In other words, the only thing we can do according to the law is to sell you Univis blanks at a specific price and print that price list and ship it to you, this we have done. In connection with the resale of Univis blanks to other than distributors, it has been my experience around the country that most of the jobbers have added on anywhere from $0.75 to the price of the blanks as they received them from us, and this becomes their standard price on resold Univis blanks.

"In the old days, when we controlled the resale price of these blanks, we established a $0.75 differential which seemed to please most of the jobbers because it represented pure gravy in that they did not have to carry stock to make this $0.75 extra. The biggest percentage of our jobbers today, when they receive a stock order from a retail account, simply send the order in to us, and ask that we ship it direct to the retailer and bill it to them. About the only expense you have is the correspondence and the bookkeeping. Quite a number of jobbers have raised their price to $0.85 in lieu of the new price schedule. Of course, when everybody gets through kicking this thing around, a whole new schedule of prices may pop out. Personally, I am just a dum guy and I don't know much about it, but it appears to me that somebody isn't doing too well down in Washington on this 3% deal. Can't anything be done?

"I realize I haven't given you much help in answering your query, but truly, Smitty, this is the best we can do. I would suggest that you contact other jobbers in your area and find out what their thinking is and you all might get together and establish what you feel is a representative price. Of course, I realize that that is collusion and that you cannot as a group decide what price over and above the factory price you intend to charge for Univis resale blanks. I will be interested in learning what you are able to do about it."

It is hard to spell out from this letter that Marks conspired with Smith or with anybody else to violate the final judgment in this case. If that was his intention he certainly had an inept way of expressing himself. It is hardly the letter that would be written to a co-conspirator. On the contrary it tells the customer the restrictions under which Univis sells its lenses, leaving it to the customer to do what it determines is in its best interest.

Thus proof in respect to the alleged conspiracy relating to the resale control of Univis blanks meets with the same fatal objection as that concerning the control of

prescription prices. The Government concedes that the mere issuance of price lists is in and of itself legal—at least it does not contend now that such issuance is illegal. The Government insists though that circulation of the lists was for the purpose of influencing prices, and that conspiracy existed within the meaning of United States v. Schrader's Sons, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471; Federal Trade Commission v. Beechnut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307, 19 A. L.R. 882. The difficulty with the argument is that the Government here failed to prove not only any concerted action among the wholesalers in dealing with their customers, but also failed to prove any consistent maintenance of the prices listed.

Again it must be emphasized that in respect to the proof of a criminal contempt the Government has the burden of proving its case beyond a reasonable doubt, Gompers v. Bucks Stove & Range Co., supra; Walling v. Crane, 5 Cir., 158 F.2d 80, 83. Respondents must be presumed innocent until proved guilty beyond such doubt, Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451; United States v. Goldman, 277 U.S. 229, 48 S.Ct. 486, 72 L.Ed. 862. In the matter of intent that too is an essential element of a criminal contempt and must be established beyond a reasonable doubt, United States v. Kroger Grocery & Baking Co., 7 Cir., 163 F.2d 168; and as to the civil contempt, as was stated in a consideration of that branch of the case relating to prescription price lists, the proof must be clear and convincing, Oriel v. Russell supra, and Kansas City Power & Light Co. v. N. L. R. B., supra. The inference sought to be deduced from the distribution of price lists in the light of the surrounding circumstances developed by the Government does not prove either of the conspiracies charged.

Accordingly the order to show cause must be denied in all respects and the petition of the Government dismissed.

In the light of the dismissal it does not become necessary to pass on the motion of the respondents on which decision was reserved to dismiss the Government's case at the close of the Government's prima facie proofs, nor on the motion of the respondents to clarify section 3(c) by adding a provision to the effect that it is lawful for the respondents to distribute price lists in the manner in which such distribution has been effected since October 1942.

Concurrently herewith appropriate findings of fact and conclusions of law will be filed.